All right, let's call case number 2, 18-4049 Mountain Dudes v. Split Rock Holdings. Mr. Moss, I know you're ready to go. Yes, I am. I can sense it. You may proceed. May it please the court, Brennan Moss on behalf of the appellant Mountain Dudes. At counsel's table with me is Mr. John Mertens, who's my partner and co-counsel in this case. This case actually started over a decade ago in a lawsuit between Mountain Dudes and an entity called Split Rock, Inc. That lawsuit ended up with a judgment against Split Rock, Inc. for about $1,175,000. And then in post-judgment discovery, we found out that Split Rock, Inc. had no assets except for what we could determine was a note, a promissory note that had been issued to it from Split Rock Holdings. That note was in the amount of $2.7 million and carried an interest rate of about 4.5% per annum. We then discovered that that note had been renegotiated and modified to be a payment of 8% of whatever the net revenue was of these build rights. Now, what had happened is Split Rock, Inc. had done a development in St. George, Utah. And in that development, they had recorded against the property these items called build rights. And what that was is when someone would buy the property and they wanted to build a house, they would have to use Split Rock, Inc. to build that house. And Split Rock, Inc. thought that that had a lot of value. And after the downturn in the economy and Split Rock ended up with a lot of judgments against it, it wanted to continue to do business but without those judgments. And so it created a number of other entities, the main entity being Split Rock Holdings. So Split Rock Holdings purchased from Split Rock, Inc. its name, Split Rock, and those build rights. And for those build rights, it gave it the $2.7 million. Later on, it believed that those build rights might not be as valuable or were concerned about it. And so it entered into that modification agreement. And that modification agreement said that whatever it was able to get from the build rights, it would pay 8% of the net. And so it essentially went from giving Split Rock, Inc. a $2.7 million note to a contingent note that might be worth, as they testified at trial, upwards of $3 million, but there was no guarantees. And that actually paid out just a little over $200,000. So in the second action, the action that's before the court today, Mountain Dude sued Split Rock Holdings and a number of other entities for fraudulent transfer under Utah's fraudulent transfer statute. And the theory in that case was when they modified the note from being a $2.7 million note to a contingent note, they gave value to Split Rock, Inc. without receiving reasonable equivalent value and or the intent to hinder, delay, or defraud a creditor. Was the theory of the case below that somehow the promissory note was breached and it was the modification that created the fraudulent transfer by hindering its value? Or was that you had some right under the asset purchase agreement that was being vindicated? There were two theories. The main theory was when they modified the note, they voluntarily reduced its value, which was the transfer. Because under the Utah statute, a transfer is considered a reduction in a note. That note was never executed, was it? Well, there's a dispute as to whether it was executed or not. Mr. Platt was the main witness. How did the jury come out on that? The jury didn't answer that question. They didn't answer that question, but Mr. Platt testified that he thought that the note had been signed. And the other evidence that we pointed to in support of that note being executed was the fact that they entered into the modification agreement. Certainly, there was no need to enter into a modification agreement if the original promissory note had never been executed. That was one theory. What was the other theory? The other theory was that even if the note was not executed, the sale of assets agreement included in Section 5 this promise to pay $2.7 million for the assets. And it said in Section 5 that a promissory note would be executed at closing on June 24, 2009. And so if a promissory note had not been executed, certainly Split Rock Holdings had taken the name, they had taken the build rights, and they profited off those build rights in excess of a million dollars. So we would have a chose of action to go and sue Split Rock Holdings. For breach of the asset purchase agreement? The asset purchase agreement. And also we could sue under the asset purchase agreement. And then what was the hindrance? If that's your theory, then to tie that to a fraudulent transfer under the statute? Also that they had then agreed to accept less under the modification agreement. Could I ask one more question? I'm sorry, I was just trying to get a clarification of his answer to your question. Because I just had one wrap-up question. Did you present the chose of action contract theory below? Where was that? That was argued to Judge Wattups in the JMOL motions. Does that adequately preserve it? I think as a legal theory, it does preserve it. Because at that point, you have a jury that's answered some of the questions, but not all of them. And the questions of fact, the judge at that point needed to determine whether there were remaining questions of fact. If there were not, he could then apply the law to the undisputed facts as he deemed appropriate. Or he could harmonize the jury's responses to that. Just so I'm clear, that theory was first raised then in your motion for a JMOL? JMOL, yes, that's right. The theory that we presented, that we were moving forward with, is that there was a fraudulent transfer through the modification agreement. And I think what ties into that is... Did the court rule on that legal theory in its JMOL order? No. Well, the judge ruled that there was no agreement initially because the promissory note was not signed. Therefore, the modification agreement, it didn't need to reach any other issues because the modification agreement was the first agreement that was fully executed. That was the judge's ruling. My concern is just the procedure. The judge did rule that the note, that there was no evidence that the note was ever signed or transferred. But that was not raised, and I expect you're going to agree with all this, but that was not raised in a 50A motion at all. It was not raised in the 50B motion at all. The district court on its own spontaneously came up with that argument. And we have said very emphatically that if even the party doesn't raise it in 50A, the party is precluded from raising it in 50B. If the party can't raise it in 50B, how can a judge, sui sponte, raise an issue that the parties didn't raise in either 50A or 50B? So to me, that procedure is the first. That's the grill in the room for me. And I would agree with that, Your Honor. I think that was a problem which we addressed in our briefs as well, is that these arguments were raised for the first time by the judge. Following up on that problem is the weighing of the evidence with the determination or the conclusion that the note wasn't signed. And what's troubling to us is the court says, even in its motion, because on a motion for judgment as a matter of law, the court declines to weigh the evidence or make credibility determinations. Then in the next sentence, it says the only testimony weighing in favor of it being the side note was the testimony of Platt, who admitted not to be the most reliable witness and stated that he had not been candid with the court in the past. So in this very same sentence or in the same paragraph in which the court is saying that it's not going to weigh the evidence, it in fact weighs the evidence. It says that there is a dispute about that evidence. That's right. Which is actually inconsistent with granting a 50B. And that's our argument, is that that's inconsistent with granting a 50B, especially with our witness, Mr. Platt, who in our estimation, in our argument, was not as truthful with the court when it benefited him. But when it did not benefit him, he had no problem being truthful. And in this case, he was telling a fact that did not benefit him. And therefore, it doesn't make sense for him to lie about that fact, the fact that the promissory note was not signed. And because it doesn't benefit him to lie about the note being signed, then the credibility, his credibility should not be questioned in that regard. Of course, we tell jurors all the time if a witness is a liar in one thing, you can consider him a liar in everything if you want. That is true. But I don't think the judge gets to make that same determination in a 50B motion. Yeah. There was one other case-related problem. RUP requires harm, not actual harm. How do you get around that broad language? Well, I think RUP's an easier case than it looks like on its face. In the RUP case, what had happened is there was a brother-in-law had allowed his sister-in-law, a single mother of eight children, to live in a house rent-free for eight years. And they had attempted, the bankruptcy trustee, after the brother-in-law had filed Chapter 7 bankruptcy, had attempted to get those rents under the Fraudulent Transfer Act. And the Supreme Court came down and said, that asset's not allowed under the Utah Fraudulent Transfer Act because it's encumbered. There was a mortgage on the property that fully encumbered the mortgage and the rents as well. So both the rents and the mortgage were fully encumbered and under the statute, any property that is encumbered is automatically exempted. That's the reason why that came down the way it did for the Supreme Court. In the bottom two paragraphs of that decision, there's some dicta explaining why that decision makes sense or why the court determines that the statute was written the way it was. And it comes up with this kind of no harm, no foul type explanation. And the court in this case, the trial court in this case, read into that saying that you also need to prove an extra step. Not only do you need to prove a fraudulent transfer, you need to prove actual harm, which the court never does in that case. In that case, the rents were clearly exempted under the statute. Are you arguing you do need to prove extra harm or you don't? You do not need to prove extra harm. That's my understanding, too. Yeah, it's under the clear reading of the statute. If it is an asset as defined by the statute, it's not encumbered, and it's transferred with the actual intent to hinder, delay, or defraud, that's a fraudulent transfer. You don't need a separate harm proof. I suppose you might need one, though, if you're trying to get damages rather than equitable relief. Well, if you have to get into that, the question is to whether you could prove damages. And in our case, we cited the court to a number of cases that said that a plaintiff only has to prove or the face value of the promissory note establishes its value. And a defendant can rebut that by showing payments. So you've got kind of a presumption so that you're not saying you don't have to prove damages. It's just presumed by the value of the transfer. I think you have to prove there's an asset. And in order for there to be an asset, there has to be some sort of value to it. It can't be encumbered. I know you have the note, but isn't there a purchase price in the asset purchase agreement of $2.7 million? Why isn't that the damages figure that you start with? Well, and I think that satisfies it as well. And we were relying on the asset purchase agreement along with the promissory note. And the court, you know, on its own, latched on to this unsigned promissory note claiming that that was the consideration for the agreement. And because that was not signed, there was no agreement, which we disagree with. The agreement was executed. And as I said before, even if the promissory note had not been executed, there's still a promise to pay the $2.7 million that could be executed. And I'd like to reserve the final $1.15 if I could for you both. You may. Thank you, Your Honor. Let's hear from Split Rock Holdings. Good morning, Your Honors. May it please the court. My name is Joseph Rona, and I'm here on behalf of Split Rock Holdings and the Combined Appellate. Where I want to begin, Your Honors, Mountain's theory of the case at trial was that Split Rock Inc., first of all, agreed to a final form of note, then executed that note, and then delivered that note. That was their theory of the case at trial, and the special verdict form that Mountain agreed to—in fact, it was essentially their form for all practical purposes—laid out that theory of the case. Now, in order to prevail on their claim, it was therefore incumbent upon Mountain to produce clear and convincing evidence that what they refer to as this original $2.7 million note, that first of all, that it was ever even reduced to an actual final form of note, secondly, that it was executed, and third, that it was delivered, because the way the agreement is structured, that's a contingent agreement. The original agreement said that this agreement is not consummated until the purchase price is paid. And, of course, the purchase price would be the delivery of the note, not even just the execution of the note. I understand that was their theory, but where in your 50A or in your 50B motion did you say, we want this verdict overturned because of the failure to prove that there was execution and delivery of a note? Right. You didn't. The way you phrase that, you are absolutely correct, Your Honor. That is the basis that the district court, sui sponte, a year later, granted a 50B relief for you on that theory, which was not raised in either your 50B or your 50A motion. And respectfully, I would disagree with the way the court has just characterized it. What we have to recognize, this is not a situation where a jury delivered a verdict that provided relief. The jury stalled. The jury on no single claim did the jury enter findings on the critical elements for every single claim. They stalled. The jury never made that finding. This is not a situation where a jury made a finding one way, and then the judge took it away from the jury. The judge essentially reinforced exactly what the jury did. The jury basically said, there's no evidence, and we're jammed up here. And the way this rolled itself out, we submitted our briefing prior to submission to the jury. We argued the original Rule 50 motion before the case was submitted to the jury. In fact, I was making the argument, I believe it's on page 834 of the record. And this was before submission to the jury, where I was arguing to the judge in support of my motion. Look, one of the problems that Mountain has is they keep trying to dance between this first agreement that never resulted in the execution of a note, and ultimately the second agreement that did result in the execution of a note, and they can't have it both ways. So we were certainly arguing that before it ever went to the jury. And that was coming to the court's attention, and we began focusing on that. Now, the reason this went on so long is the court kept going back to Mountain Dudes and saying, you know, Mountain Dudes, you're making arguments that you don't have support for. I'm going to give you an opportunity. And if we look at the record, it's the trial court constantly giving Mountain Dudes a briefing opportunity post-trial. And Mountain Dudes was never able to come up with a, number one, any evidence it could point to, and number two, a satisfactory argument. So I'm confused. The jury never entered a verdict and was discharged because they were wrong. Correct. So are you saying that the 50A and 50B standards are inapplicable here because we don't have a jury verdict, and that even though they called it 50A and 50B, it was really a belated motion for summary judgment that we should look at it? No, I'm not saying that. You're not saying that? I am not saying that. You are agreeing that this is a bona fide 50B ruling? I mean, bona fide, that is procedurally that this has to meet the 50B test? Yes. Okay. Yes. 50B is to set aside a verdict. We don't have a verdict by the jury here. Well, I'm sorry, and we say 50B. It was really 50A. I mean, these are Rule 50s, and you can bring the motions before the verdict comes in, which is exactly what we did in this case. So you're saying that it never got to be a 50B because there was no verdict to set aside in the first place? Correct. But even if we were to say, okay, then we'll look at it as a 50A because there's no jury verdict out there yet, where in any 50A motion did you people argue to the court that you should get relief because of a – Our argument was – Because the note wasn't transferred. Our argument was if we consider this two agreements, argument was the first agreement did not result in a transfer, and we were saying that, and that's why I point to 834 in the record, even in my argument in front of the court. And my argument was while there was an original agreement, an overall agreement that ultimately was executed – And by the way, and this is another critical fact, Mr. Platt testified under oath that that agreement was not executed on June the 24th. His testimony was it was an ongoing process, and they signed it sometime later. And the reason that's critical is the agreement states that the closing date on the note was supposed to be at 10 a.m. on June the 24th. And that's why we said in our brief there really was no closing date in the original note. We were making that argument in the briefing. I know you made the argument in the briefing. And at trial you made the argument. But that is simply not the argument that was made in your 50A at all. Your 50A was limited to that the only person that should be liable here is the signing party and not the others. That certainly was one argument that was made. That was it. That was one argument that we made. No, that was the only argument that you made in your 50A. And, well, I submit that... And that argument as a matter of law is probably incorrect. And my argument, as I'm saying, when I was at the podium making oral argument, I was not making the argument that it was strictly limited to split rock holdings. I was making the argument that they had not produced the evidence to demonstrate a consummation of that original transaction. Well, I've not seen the transcript of your argument. I'm not even sure that's part of the appellate record. Did you make it part of the appellate record? Yeah, it's page 834 in the appendix, in the Applebee's appendix. And the other points that I want to make this morning are mounted in addition to failing to produce any evidence of this signed note, which Judge Waddup's found. And you're saying the asset purchase agreement was not final until the execution of the note? Yes. By the way, Judge Waddup's also went beyond that. That was the other question that Your Honor asked, which is regard to sort of treating this original agreement as some kind of chosen action. Right. And what happened was mounted as they were now facing the dilemma that they had failed to introduce evidence and they had no evidence because it didn't happen. As Patrick Manning testified, the original note was never executed. That original transaction was never consummated. One of the things that Judge Waddup's keyed in on is, well, wait a minute. First of all, you're shifting on me, which you're not entitled to do. We have to live with the theory of the case that's in the special verdict. Judge Waddup also said if you're now going to shift to this chosen action theory, you didn't produce any evidence of the actual value of that chosen action theory. That's different than an executed note. Wasn't the chosen action the value of the purchase price that's embodied in the contract? No, because when you don't have the note being completed, in fact, if you read the language of the purchase agreement, it even says this is not necessarily the final note. And what you have are the parties then saying these deed restrictions could end up being unenforceable. And so if they're unenforceable, they have a different value. And so what you have is an agreement without a note. And as Judge Waddup said, what is the market value of that chosen action? Because the law says you determine the market value at the time of transfer, and we don't have a transfer occurring in that original agreement. There's no time of transfer. There was no execution and no delivery. That's one of the critical points. And so the time of transfer, the only time of transfer, is when the second note is executed. And Judge Waddup said to Mountain, you never produced anybody, you never produced any evidence of what this chosen action might be worth out in the marketplace. Now, in their appellate briefing, Mountain tries to get around that by saying, well, the negotiable instrument, it's prima facie evidence, the face value. But we don't have a negotiable instrument in that first instance. We don't have an executed promissory note. It was never executed. What the testimony was at trial is when these groups of individuals that are involved in Split Rock Inc., Split Rock Holdings, began trying to determine what they wanted to do, basically a new partner came into the picture whose name was Patrick Manning. And it was Patrick Manning who was telling the Old Guard, hey, guys, these deed restrictions are probably unenforceable. So they stopped where they were. And over the next few months, the evidence was manifesting itself that they probably were not going to be able to enforce these deed restrictions to create capital out of these deed restrictions. And so they said, we have to come up with a note that is actually functional and that is real. And if we make money off these deed restrictions, great, that money is available. If we don't make money off these deed restrictions, obviously the things we're transferring have a different value. And so they executed a note that was very real. And the whole point of the fraudulent transfer statute is to deal with situations where you have debtors not dealing in reality. This is the absolute opposite of a fraudulent transfer situation. And that also goes into Judge Waddup's decision on Rupp when he looks at what the Utah Supreme Court says in Rupp. Now, the Utah Supreme Court in Rupp was interpreting Utah's fraudulent transfer statute. And the Utah Supreme Court said the way we read this statute, it requires a real harm, a real tangible harm. And Judge Waddup said, well, look, in this situation that we had in this trial, Mountain, you failed to produce any evidence that there was any real harm. This second note was actually the more accurate and the more reliable note. And had the deed restrictions been enforceable, you would have received more money. As I understand the law in the Utah Fraudulent Transfer Act, actual harm is not an element. That's not the way it was in Rupp, Your Honor. And it seems to me what Judge Waddup's role in that instance was, was to apply Utah law the way he viewed, the way he thought the Utah Supreme Court would apply that law. And he read Rupp. And what the Utah Supreme Court said in Rupp is, here's how we read that statute. And so I think that Judge Waddup was correct in that instance. Now, with regard to the arguments by Mountain Dudes, and I'm almost out of time, so I know I'll probably speak fairly quickly. Mountain Dudes is now trying to get around the fact that they have an incomplete jury verdict. I mean, there was never even a damage finding by the jury. And yet Mountain Dudes is asking this court to install its own damage finding and deprive my clients of their fundamental right to a jury trial and all the critical elements. Mountain Dudes keeps citing the Doman v. Vigil case. And here's, perhaps I'll only have time to make this final point. The Doman v. Vigil case does not stand for the proposition that Mountain Dudes is arguing. In Doman v. Vigil, that was a negligence case, the tort of negligence. The jury came back. They did not fill out every interrogatory in the jury verdict form. But they unanimously found that the actus reus in that case, the events, were not the proximate cause of the plaintiff's injuries. So the fact that they didn't answer the other interrogatories was mooted by that finding. That finding was fatal to the plaintiff's damage claim. But you can't take that and run it in reverse. In other words, you can't take Doman and have Doman then stand for the proposition where a jury fails to make a finding on every single critical element. The plaintiff automatically gets a win because the jury found on one of perhaps the two or three or four central elements. Well, under their chosen action theory, why isn't the value of the $2.7 million, the purchase price embodied in that contract? For exactly the reasons Judge Waddup said. That when you have an agreement, but the agreement says this agreement isn't completed until the purchase price is paid. And then the parties to the agreement decide we are not going to execute the fundamental. It's an integrated exhibit, by the way. So we have an incomplete agreement. So there was never any agreed on consideration? Is that what you're saying? Yeah, that's part of what I'm saying. And this is also important. Joseph Platt testified at trial, and this is on page 746 of the appellate record. He testified three times at that trial. And that's important. We don't see Mountain Dews ever trying to pin Joseph Platt. Was there ever a final form of note? When they showed him the draft note, he said, I can't even tell you if this was the final version of this note. I mean, he testified to that. He also testified later, and this is at 746 in the record, that with regard to even the signatures on the agreement itself, the fact that it's dated June the 24th, he said that's not the date. It was an ongoing process. Who was he? Which witness? Joseph Platt. And he was called by both parties. And so what we have here is, and I'm over my time, Your Honor, just to finish this particular sentence. What we have here is a situation where there, and this was my argument, my Rule 50A argument, there never was an initial transfer, the first note, the first agreement. There was a failure of evidence. And that's why, Your Honor, I was always framing my argument in forms of a transfer. I wasn't saying there was no evidence that a note was not signed. The concept I was speaking of was broader, but I was absolutely making that argument prior to the submission of the jury. Thank you, Your Honors. Thank you, counsel. I appreciate that. Would you add a minute to the rebuttal? Hold on. Make it 2.30. Perfect. Thank you. You may proceed. Just to start with the last point there with respect to Mr. Platt's argument, I want to point out to the Court that in the Appellee's errata sheet, they do strike this argument that they say, or the factual allegation where they say, that Platt testified that many different versions of the $2.7 million note had been circulated. They had made that argument in their brief. We pointed out that it was incorrect, and then they had stricken it. Platt's argument, or Platt's testimony, was that he thought the note had been signed, but he was not sure. With respect to Mr. Manning, Mr. Manning wasn't part of Split Rock Inc. until the end, and there's a letter saying that he was doing some marketing. Mr. Manning was not a signer on any of the sale of asset agreement or any of the subsequent documents, would not have knowledge of whether it was signed. And even in that capacity, in one instance he said he wasn't sure if it was signed, and in another he said that it wasn't signed. But again, there's other evidence. Did you make an argument, a best evidence argument, that even though the evidence, we only have an unsigned note, that that's the best evidence of a signed note because the signed note's missing? Did you ever make that best evidence argument? I can't think exactly where we did. I think that we made that in our GMLOL argument to Mr. Wattops, but I can't think of the transcript or the page where I can point you to for that. Go ahead. That follows our line of reasoning, though, in that Mr. Platt testified that this thing, he thought it was signed. All the documents were signed on that day except for the note that we have, all the documents that we have. He believes that it was signed. It doesn't make any sense that the note was not signed. There's no dispute that that was the note that was attached to the exhibit. Do we have a jury finding, though, on that disputed evidence? We don't have a jury finding as to that disputed evidence. There is a question of the jury as to whether there was a mutual mistake between the value of the bill rights, and that goes to the defense that they raised. The jury did find that there was a mutual mistake, but they also found that Split Rock Holdings was the one that bore the burden of that mistake. Could you also respond to Mr. Rona's argument that the value of the contract, the chosen action, would be at the time of the transfer, and there was no evidence of the value at that time presented to the jury or to the court? Yeah, that goes back to the original point, which the plaintiff's duty is to prove the value of the note. The note that we presented was the $2.7 million on its face. Defendants have the burden to show that it's worth less than that. They didn't provide any evidence that the court could rely upon to show the note was worth less than $2.7 million. So the court actually has it backwards. The trial court judge had that burden backwards. Once we presented that note, then we'd met our burden. I'm having trouble about the applicability of Rule 50A and B at all in this case, because we don't have a jury verdict. 50A and B is to set aside a jury verdict. It looks to me like this is really more like a motion for summary judgment. Could you just address that? Well, quickly, Your Honor, I think what we have asked for is that we think that the court's duty was to harmonize the jury's answers, that it did make, and see if it could harmonize the rest if there were no disputes of fact. But the jury never entered a verdict, right? It never did. It never said this is our verdict. It said we can answer one question, and we're deadlocked on the others. And so the jury was dismissed. That's right. And was any verdict at that time entered on behalf of the jury decision? It was not. And so it has to harmonize it or order a new trial. But, I mean, it's not like the jury said we've come up with one thing, we can't decide the others, but here is our verdict. There just wasn't a verdict ever entered by the jury. The jury never returned a verdict. So I'm not even sure that 50A and B apply. I mean, it looks to me like it's more like a summary judgment process that you're saying. I'm just very uncertain about the procedure of this. I think it's abnormal, Your Honor. And for that, we've asked the court to remand this for a new trial if they cannot harmonize the jury. But you've never had a trial. I mean, you've had a trial, but you've never gotten a verdict out of it. So I think we need a new trial. All right, counsel, thank you. We understand your arguments. I appreciate that. You're dismissed, and the case shall be submitted.